### SAMUEL C. SULPHEN V. JOHN NORRIS.

1. **PRESUMPTION OF GRANT.**—In cases of long-continued possession of land, where title is to be shown from the government, the rule is that juries may be instructed that they may presume a grant to have issued, not that they must so presume; nor will the presumption be entertained in behalf of a plaintiff who, in making out his case, shows that in fact no grant ever issued, or where he fairly rebuts such presumption.

2. **SAME.**—Cases may be found where juries have gone to the length of presuming a grant, in the face of the almost-admitted fact that none in fact existed. Such cases are referable to incorporeal hereditaments and not to the thing or fee.

3. **SAME.**—A presumption cannot, for its support, rest upon another presumption. The policy and law of Spain forbidding grants of land to foreigners, where it was sought to establish a grant anterior to 1824 in favor of a citizen of Maryland, it was error to refuse to instruct the jury "that it devolved upon the plaintiff to show that the alleged grantee was a competent person to receive and hold such grant, and such fact must be established by proof, either positive or circumstantial, and not a mere presumption."

4. **SAME.**—Where a party asserts the existence of a grant from long possession the possession should extend to definite and distinct boundaries.

5. **LIMITATION.**—While a grant to the fee may not be presumed against the State, yet upon the location of a valid certificate upon the land by another, the possession continued for ten years from such location, would confer title to 640 acres, including the improvements so held.

APPEAL from Nacogdoches. Tried below before the Hon. M. Priest.

John Norris brought trespass to try title against Samuel C. Sulphen, alleging that, as one of the heirs of Edmond or Ramundo Norris, he was the owner of seven-twelfths of a tract of land in Nacogdoches county of four leagues, and known as Ranche Naconichi; alleging a grant in 1810 to Ramundo Norris; that the grant was lost; continuous possession of the land from 1806 and from the issuance of the title; possession under it by Ramundo until his death

in 1829, and by his descendants afterwards, and up to the institution of suit.

The defendant demurred, and for special exception urged,

(1) "That the petition did not show by any facts alleged that the ancestor of plaintiff, Ramundo Norris, had any capacity to or qualifications for receiving a grant from the Spanish government.

(2) "That the petition did not state by what officer, either by grade, name, or jurisdiction, or at what time or place, the grant was issued to the ancestor of plaintiff under which he claims."

He also pleaded not guilty.

The demurrer and exceptions were overruled.

On the trial Vital Flores, for plaintiff, testified, "I knew plaintiff in 1807; he lived at the ranche Naconichi, in Nacogdoches county with his father; since that time have known him in said county. I was acquainted with his father also in the year 1807, and from that time until his death. He lived at the ranche Naconichi. He died in the year 1829 at the ranche Naconichi.

"The place Naconichi is situated near the Bayou Naconichi, and is the place where Lewis Knight once lived; first knew it in 1807, when it was claimed by Ramundo Norris, and was so claimed and occupied till his death, and since that time by his wife and children. I never knew any other claimant to the ranche.

"I am near 80 years old. I held the office of preanador in 1831 under the Mexican government, and in 1834 I held the office of alcalde; held both offices for the term of one year.

"I know the father of John Norris is dead; he died at the ranche Naconichi, in Nacogdoches county, in 1829. He was married. His wife is dead; she died in 1848, at John Norris' house. He left children, the issue of the marriage. I knew six, (giving their names.) I know that all the children except John Norris are dead. I think all their

children are dead. I do not know anything about the boundaries of the grant. Ramundo Norris continued on said grant from 1807 to 1829 without interruption. John Norris and his mother possessed and occupied said place after Ramundo's death until the death of Mrs. Norris, and John Norris continued to occupy and possess the same to the present time through tenants. They possessed and occupied said place under the claim of Ramundo Norris. John Norris has occupied said grant since the death of his parents, claiming the same for himself and heirs. The extent of the claim is four leagues. He has occupied the same through tenants since his father's death.

"Ramundo Norris made considerable improvements on said ranche in the year 1807 at the place known as ranche Naconichi. I first knew said improvements in 1807. His dwelling house was situated in the centre of the ranche."

Absalom Gibson knew John Norris in 1836 or 1837; made a survey of the Norris grant April 6, 1838. John Norris claimed said grant as one of the heirs of his father's estate.

John Norris, plaintiff, testified that he was born in 1800, in Louisiana, near Bayou Beoff. His father came to Texas and bought a ranche, called Naconichi, from McWilliams, (or Maculinis, the Spanish rendition.) When his father Edmund (or Ramundo) Norris first went on the ranche it consisted of a very small coop of a hut, and, perhaps, a pen for cattle. His father, soon after he went upon the land in 1806, commenced improving on it, built houses, cleared land, &c., at the place since known as the ranche Naconichi, which is about one-fourth mile from McWilliams' settlement above named. McWilliams committed some offense and left the country, and witness never heard any more of him.

The government granted his father, Ramundo, the land in 1810. Remembered that in 1810 his father came home one day and told his (witness') mother that he had petitioned for

the land and it had been granted him, and that soon after, perhaps next day, Jose Maria Gaudiana and Padre Procella came out to his father's house, and witness understood that they came for the purpose of putting his father in possession of the land, and he saw them ride off from the house for that purpose; did not see them mark any, but heard they marked a pine on east side of the grant, but don't know how he learned it; did not learn it from Gaudiana or Procella. The tree is still standing, has top broken off; has often seen the old mark upon the tree.

When Guadiana and Procella came to his father's in 1810 to put him in possession, they started from his father's house, the ranche Naconichi, and went three miles north; then came back to the ranche and went three miles east; then came back to the ranche and went three miles south; and then came back to the ranche and went three miles west. Witness understood from them and his father at that time that they had surveyed out the grant of four leagues and had marked the corners; and he afterwards saw the marked corners and recognized the pine tree with the top broken off, which he heard them name as one of the corners at the time. The tree still stands and with the marks upon it. Understood the grant was from the government of Spain, and made by Salcedo. Recollects that his father said to his mother that Salcedo had granted him the land. This was in 1810, and his father always after that time claimed the land as having been granted to him by the Spanish government. * * * Witness understood afterwards that the government called all the grants in for confirmation. * * * In 1813 war broke out between Spain and Mexico, and there was great confusion in the country, and here about Nacogdoches no man's life was safe; and his father, Ramundo Norris, and family, and all other citizens left and went into Louisiana; all left to save their lives. His father and family settled near Logansport, built a house and opened a small farm, where they remained until

1820, when the Mexican authorities invited all the citizens to come back. His father came back and went to his old home on the ranche Naconichi. Until this time it was not considered safe for any one to return. No one of the family visited the ranche from 1813 to 1820. They left the country because of the war and dangerous condition of the country, and because no one's life was safe. It was not on account of hostile Indians. Ramundo was always regarded a good citizen from the time he first settled here in 1806 up to his death in 1829, and was so recognized by the government authorities. He never took up arms or rebelled against the Spanish or Mexican government.

In 1824 Mr. Gaines, who was son-in-law of Ramundo Norris, went to San Antonio and brought home the title of 1824, and told his father, Ramundo, that he had brought his title papers, and that he (Gaines) had to prove that he was his (Ramundo's) son-in-law before he could get them. A few days after Jose Antonio Sepulvedo, assisted by Ramon Chevano and Jose Cordova, came out to the ranche and put his father in possession and surveyed the land. Witness and his brother, now dead, assisted in surveying—measured with ropes on horseback—went three miles north and marked a tree; then returned to the ranche and went three miles south and marked a tree; then returned and went east and did the same; then returned and went west and did the same; marked at each cardinal point, making no lines from the ranche and points, and none around the land from point to point. The eastern mark made by Sepulvedo was not far from the old pine marked by Guadiana and Procella, with the top broken off, as mentioned before. * * * From 1810 his father always claimed that the land had been granted him by the Spanish government; it was then recognized by the citizens and authorities. * * * Witness never saw the grant of 1810; don't know that it was lost. His understanding was that when Salcedo called in the titles in 1810 his father's title went into his hands

and was carried off to San Antonio, and that in 1820, when his father returned to the ranche, the title or grant was lost or gone and could not be had. In 1810 all the title papers were called in by the authorities for some action to be taken on them; understood that it was for them to be confirmed. In 1829 his father died on the ranche, and in 1830 witness and mother moved off to near Attoyac river, in Nacogdoches county, where he has since resided, and where he got a pre-emption. Witness kept tenants to hold it all the time, (witness gave names of the tenants;) there may have been intermissions between tenants, but if any they were short.

Witness remembered that when a small boy Matias Pena was at his father's, and Santos Coy, a neighbor, and they had a conversation about the conflict with Pena, and Pena said if there was not land enough for father he, Pena, would make it good out of his land. Father spoke little Spanish and Pena little English. Coy acted as interpreter. Witness was a small child; it was about the time of granting the land in 1810. Surveyors in those days measured land with ropes on horseback, and thus Guadiana and Procella measured his father's land in 1810 and Sepulveda in 1824. His father was a Roman Catholic, and was born in Maryland, in the United States.

A. A. Nelson, for plaintiff, testified that he had been surveyor in the county for most of the time since 1838, at first deputy, then principal. The Norris grant was not put on the county map when first compiled in 1840, though such a survey was known to exist. It was mapped in 1846. It is within the border leagues. Some surveys were made in conflict as early as 1838.

Plaintiff then read from an old abstract of land titles a description of the Norris four-league grant, as of date April 5, 1824.

Plaintiff read certified translation of documents from the General Land Office, and the same in connection with depositions of Jacob Koechler, Commissioner of the Land Office,

14

that the originals were in the land office and could not be withdrawn, as follows:

"SENOR GOVERNOR: I, Ramundo Norris, of English descent, for more than eight years an inhabitant of the post of Nacogdoches, in best legal form and manner, appear before you and say that since I came to this country I obtained by purchase and legal right a ranche called Naconichi, the śame which I now possess, and where I have the home for my cattle. But Maculinis, of whom I bought the same, and who had it from Mathias Pena, of this place, had the same not legally transferred to me on account of his going to San Antonio de Bexar, from whence he fled to Natchitoches. I now appear before you to obtain lawful possession of said ranche, and that you may be pleased to ordain that there be given and pointed out to me by a formal and approved instrument in writing one league of land in each quarter from my cattle-house, or so much as is consistent with legal purchase right. Therefore I pray you may be pleased to decree and ordain as proposed, swearing that I act in good faith, whereby I receive justice.

"I pray that this writing be admitted, although on common paper, having no stamped paper; post of Nacogdoches, April 13, 1810; and not being able to subscribe, I request Mr. Manuel Bustamente to do it in my name."

"At the request of the party I sign the same.
                                        MANUEL BUSTAMENTE."

"SAN FERNANDO DE BEXAR, *5th of April,* 1824.

"The citizen Jose Antonio Sancedo, first voter of the most excellent provisional deputation, and meantime political chief of the province of Texas, in view of the foregoing document and representation by Ramundo Norris, an old inhabitant of the post of Nacogdoches, and minding his merits, and that owing to former incidents, the Governor of this province, Lieut. Col. Manuel de Salcedo, could not authorize and approve the sale of the tract which the said

Norris claims, and which was sold to him without legal form by Maculinis, who had acquired the same of Mathias Pena, as is shown by the foregoing document, and using the authority which the law permits, I approve and confirm in all its parts the sale of said tract made by William Maculinis without legal form to said Ramundo Norris, dispossessing any individual who claims the same under inferior rights; and that this disposition may have force and the necessary effect, I appoint the mayor of Nacogdoches, Mr. Juan Seguine, to survey the four square leagues which were sold to the party interested, and that he put him in personal possession of the same, to enjoy them in entire freedom, giving to him the authentication which he requests to serve as title, and this dispatch with its further proceedings to be returned to this government for preservation in the archives of this province.

                       " JOSE ANTONIO SANCEDO."

    "Assisting witnesses:
" MANUEL ITURRIE,
" CASTILLO VICTORIANO ZEPEDA.

" In the post of Nacogdoches, the twenty-ninth day of the month of July, in the year one thousand eight hundred and twenty-four, I, Jose Antonio Sepulveda, commissioned by said Juan Seguin, on account of his sickness, and in obedience to the foregoing decree of the citizen Mr. Jose Antonio Sancedo, first voter of the most excellent provisional deputation, meantime political chief of the province of Texas, proceeded, with witnesses as my assistants, to the ranche and house owned by Ramundo Norris of this place, and not finding contradiction, in obedience to above order made the first survey from there, to wit, in the north one league in full quantity, one league in full quantity in the south, and one in east and one in west in full quantity; and taking him by the right hand and conducting him to the said tract in order to give him possession of said four square leagues in the said

ranche of Naconichi, giving him notice that besides the annual cultivation as he promises, he is to put marked stakes on each line of said ranche, and I unrooted plants and made other demonstrations of actual concession, which I gave him in the name of our Mexican nation, which God preserve, before assisting witnesses, who, together with me, sign the present on unstamped paper, to which I certify.

JOSE ANTONIO SEPULVEDA.

"Witnesses present:

JOSE + CORDOVA,
  his
  mark.

RAMON + CHAVANO."
  his
  mark.

"Having seen the foregoing right of possession given by Commissioner Jose Antonio Sepulveda, inhabitant of the place of Nacogdoches, to the inhabitant Ramundo Norris, in accordance with my decree of the last past 5th of April, and without any contradiction in parts, I approve and confirm this gift of the said ranche of Naconichi, with the said surveys, to the said Ramundo Norris, and as he joined our Mexican nation, which God may always and forever preserve, and in right of inheritance I give it to him, his children, and descendants, with the right to sell and free to do as with his own property, but with the distinct condition that he has to keep àrms and horses, and be ready to defend the country against the insults of enemies, and to march against them when ordered, and that he has to keep his house and ranche in good repair.

"The original is to be filed, and a certified copy of it to be given to the party to be preserved by him."

The defendant examined Vital Flores, whose depositions had been read by plaintiff, and he testified upon the witness stand as follows:

Witness knew Ramundo Norris; he came to the country in 1807, and settled on ranche Naconichi, and lived there till 1813, when he left the country with every one else.

Witness remained in Louisiana near Norris until about 1820, when witness went to San Antonio. On his return to Louisiana he met Norris and sons driving their cattle, and they told him they were going back to the ranche Naconichi. Witness did not visit the ranche from 1813 to 1827; indeed did not return to the country to live until 1827; saw Ramundo Norris there in 1827 or 1828. Ramundo never told witness how much land he claimed until after 1824, and about 1827, when Jose Antonio Sepulveda told witness he had put Norris in possession of four leagues. Witness knows nothing of the boundaries of the grant. Norris was much liked by the people and officers of the government. He appeared to be a foreigner, and could not speak Spanish well. Witness was born in 1790. Knew Salcedo. He was here in 1810 three or four weeks for the purpose of extending titles and confirming titles; that he was killed in 1813, near San Antonio. The revolution broke out in 1810—Mexico against the Spanish. Salcedo was killed by the revolutionists, and they were defeated near San Antonio by Aredonda. Aredonda came on to Spanish Bluff, on Trinity river; killed some of the people; some fled to Nacogdoches, and caused a general stampede from the country in 1813, and Norris went off with others. * * Witness knew Wm. Barr, an Icelander; also, Samuel Davenport, an American; they came before 1800. Witness knew them here when he first could remember anything. Barr and Davenport had a license to trade in the country; had a large store and warehouse. They had a ranche on the Angelina river in 1810, a Mexican family living there, with many peons, and raised a great deal of corn, and had much stock and horses.

Witness don't know if Norris had a license to live here or if he had been made a citizen. Under the laws of Spain no foreigner could be made a citizen. It is possible that there might have been some power in the governor to confer rights of citizenship on foreigners and witness not know it.

The customary manner of surveying about 1810 was with a rope on horseback, and in surveying four leagues the surveyor commenced in the center, and would run three miles to one cardinal point, then three miles at right angles to a corner of the four square leagues, then at right angles six miles, then at right angles six miles, then at right angles six miles, and then at right angles three miles to commencement. Witness never saw the boundaries of the Norris survey; never looked for them.

Witness was born in Nacogdoches, and has resided there during his whole life, except the period of his absence from 1813 to 1827; that John Norris, Francisco Cordova, of Louisiana, and himself are the only persons living whom he knew in 1810.

Guadiana and Procella, who are said to have surveyed the four leagues in 1810, Sepulveda and the assisting witnesses, and those named in the title of 1824, are all dead.

Witness is acquainted with the form and manner of issuing Spanish titles about 1810. The various steps for making a title to land was for the applicant for land to make out and present to the governor his petition in writing for the grant of the land which he desired. This was received and examined by the governor, and if the governor was satisfied to make the grant he then appointed commissioners to go upon the land designated and mark the boundaries, and measure the quantity to be granted, and to put the applicant into possession. The commissioners were always appointed in writing, and they made their return showing how they executed the commission also in writing to the governor. Then the only act necessary to complete the title was the governor's approval of the action of the commissioners, which followed the commissioners' return. No further action was necessary. These papers were attached together, and a copy of them given to the grantee as a testimonio and the original was retained in the office.

The defendant read in evidence two patents for a league each adjoining and upon the land claimed by plaintiff.

Among other charges refused, the defendant asked the court to instruct the jury (this is referred to in the opinion) " that where a party asks a presumption of grant from long possession the possession should extend to definite and distinct boundaries ; a paper title, having commencing corner, with distances and courses from that corner describing boundaries, will be sufficient ; but where a title is to be presumed the boundaries are one part of the title, and must be established by proof of possession to definite and distinct boundaries ; and in order to find for the plaintiff you must be satisfied that Ramundo Norris possessed and claimed the land by definite boundaries."

The jury found a verdict for plaintiff, upon which judgment was rendered, and defendant appealed.

*Peyton F. Edwards*, for appellant.

The plaintiff below, John Norris, rests his claim to the land upon "presumption of grant," claiming that a ranche called "Naconichi," containing four square leagues of land, was granted to his ancester, Ramundo Norris, by the proper authorities of the government having the "eminent domain" of Texas ; that said ancestor went into possession of the land in 1806, and it was granted to him sometime after 1806 and before 1824, and that he remained in possession under claim of title from 1806 to his death, and his heirs (one of whom is said John Norris, plaintiff) since that time using and occupying said land ; and that owing to the great lapse of time, destruction of archives, and revolutions and changes in the country, his grant has been lost.

It is much to be regretted that there is considerable confusion in all the books and decisions in regard to the legal rules governing "presumption of title," owing to the great variety of acts and facts incident to human affairs, the conduct of governments, and the necessity of each case of "pre-

sumption" of this character standing, as it were, distinct of itself, claiming to be adjudged on its own merits, and the difficulty of laying down any rule that would not be found to require modification in its application to the circumstances of each particular case.

This confusion has been increased by the failure to discriminate in the decisions of our own Supreme Court between the term "grant," as describing a title emanating from the Spanish or Mexican sovereignty to lands granted to individuals, and the term "grant" at common law, which was the proper technical name for a conveyance of an incorporeal hereditament, whether the conveyance was from an individual or the crown. (2 Bl. Comm., 317.) Presumption at common law applied to only such things as lie in grant. (3 Wash., 306; 2 Bl. Comm., 265; 1 Lomax Dig., 614; Cruise's Dig., title XXXI, chap. I, sec. 5; 3 Kent's Comm., 445, note *f;* also quotation from Greenleaf in Lewis *v.* San Antonio, 7 Tex., 305.) The great case of Coolidge *v.* Learned, 8 Pick., 508, quoted so much in that decision, was in regard to an incorporeal hereditament; so also in Johnson *v.* Ireland, 11 East., 284. And the case of the "Forest of Dean," cited so much, (see Lewis *v.* San Antonio, Greenleaf, &c.,) cannot carry full authority, as it was not necessary to decide that point. See also 2 Wash., 293, note 2, and cases cited. It appears further, from the authorities cited, that some kind of incorporeal hereditaments were not wholly created by grant, but must also be by grant placed on the record, and this class could not be prescribed for.

The cases in Lewis *v.* San Antonio, 7 Tex., 288, Herndon *v.* Casiano, Id., 322, Paul *v.* Perez, Id., 338, are all cited here to show that the authorities and cases relied on in deciding the question of presumption of grant, arose without perhaps an exception in reference to incorporeal hereditaments, and as to such things as at common law "lie in grant."

In support of the dicta in these decisions I will say that
the cases cited show that a "grant" of an easement may
be presumed in less than twenty years, but that this pre-
sumption, when the cases are looked to, is never made
against the crown in so short a time, and never between
individuals, unless there is corroborating documentary evi-
dence showing strong legal rights and equities in favor of
the party in possession.

It is proper for the court in deciding cases of this charac-
ter to refer to the law of presumption as to incorporeal
hereditaments, for it is by analogy to these that this doc-
trine of "presumption of grant" from the government has
been manufactured by the courts. For all the common-law
writers say there can be no prescription as to land; but as
incorporeal hereditaments arise out of lands the analogy is
fair and just. But it should always be recollected that all
the common-law writers and the decisions on this subject
recognize that the "presumption" arises in cases of incor-
poreal hereditaments more readily than as to land, because
the title to the former is by simple grant, and may be easily
lost, but that to the latter is matter of record, and must be
shown by the record itself, which, being a public and not
private document, is not so readily lost. It should be borne
in mind that although the grants from the crown for the
former are not matters of record, still it required a longer
time to permit the presumption of grant than between in-
dividuals, because of the rule *nullum tempus occurrit regi;*
and admitting that the courts could establish a rule of pre-
scription by analogy to the statute of limitations as between
individuals, it could not do so as to the crown; and it is
further shown that those incorporeal hereditaments that
were not simply created by grant, but were also required to
be of record, could not be prescribed for, thus making the
species of conveyance and its liability to be lost the main
foundation for the prescription.

By careful examination of all the cases cited in the decis-

ions of our State, as confirming the doctrine of presumption of grant from the government, it will be found that where the English judges and those of the other courts cited use the term "presumption of grant," it refers to grants between individuals and not from the State or government, and the want of careful discrimination has applied these expressions describing conveyances between individuals to "grant" (*i. e.* Spanish or Mexican titles) from the government; and if this is borne in mind, the substance of those decisions will be harmonious.

Having thus made some general remarks on presumptions of grant, I propose to consider whether or not these presumptions arise under and are controlled by legal rules, and if so, what those rules are.

It is said by this court in Taylor *v.* Watkins, 26 Tex., 688, that the presumption is one of fact and not of law, and it "is a question for the jury." Now it certainly cannot be contended that the whole evidence would go to the jury uncontrolled by any legal rules, for in that case itself the court decides that instructions given by the court to the jury, that they might presume a grant after fifteen years of uninterrupted possession, were wrong, and the jury found in that case that the facts established the presumption of grant, which was reversed by the court, thus controlling the action of the jury.

A fair understanding of what a presumption is, is necessary to the decision of this question. Matthews on Presumption, page 1, says: "Presumption is a principle of law by which, for the furtherance and support of right, facts not established by direct evidence are inferred from circumstances."

We prove that a man was struck by a pistol ball by showing the aim, the shot, the wound, and the ball, but no one could say they saw the ball strike him. Then, from the known connection of these facts, we raise the presumption that the ball came from the pistol. So when in an action

of trespass to try title the plaintiff legally resorts to a copy
from the records of a deed on account of loss of the ori-
ginal, the record of the instrument raises a presumption of
the existence and execution of the original, and the jury
are told to consider the certified copy as proving as much as
the original.

Juries are to decide causes and find the existence of facts
according to legal rules, and they are as much bound by
legal rules when the question is whether a grant is to be
presumed as in any other case.

It is true in this class of cases, and in raising this kind of
presumption it is very difficult to lay down rules adapted
to the different circumstances that may arise in each particu-
lar case; still there must be some general legal rules to es-
tablish, govern, and control in this class of cases; other-
wise this branch of the law would be a farce, the rights of the
government and of individuls would be wholly in the hands
of the popular will and unrestrained judgment of a jury, and
all cases of title to land of this character would be a mere
matter of chance and adroitness in controlling a jury.  If
this presumption of grant is really a class of title of stand-
ing in our courts, it must be defined by the law, so that one
claiming under it or adversely will know legally his rights
and be prepared to assert them.

To my mind they are clear, distinct, and consistent legal
rules that apply to all these cases alike, and that the con-
fusion that appears in the cases decided and the authorities
will vanish when these rules are properly applied.

There seems to be two classes of " presumption of grant,"
or rather " presumption of title," and it is necessary to
distinguish between them, as the .rules applicable to each
are somewhat different; and as many cases combine both
classes, a clear understanding of the principles relating to
each will prevent confusion in their application.

The first of these I would call presumption of grant proper,
and is distinguished from the other by having the quality

of immemorial, continued, uninterrupted, adverse use and enjoyment of the land under claim of title, and in this class of cases the jury are instructed that they may presume a grant even from the government if the possession has all these qualities and is connected with facts and circumstances not inconsistent with the existence of a grant, with this additional qualification, that if the presumption is to be made against the government it must be shown that the claim of title could have a legal commencement. (See Starkie, 1205, 1207, 1221 ; Matthews on Presumption, ch. XI.) "Lapse of time since the first commencement of titles which depend for their validity on the doctrine of presumption is, in all cases, an essential and in some the only inducement to the presumption requisite to their support," refers to Sullivan *v.* Alston, 2 Hay N. C., 128. What Matthews says about the two kinds of presumption as I here lay them down, (same chapter :) " It is on the consideration just adverted to, and with a view to give effect to long and quiet possession, and to corroborate and affirm titles which are founded chiefly or only on this circumstance, that the courts will in many cases presume the previous existence of such instruments of assurance as aid to clothe that possession with the legal title.

" In some cases this presumption is made without any specific evidence of the existence of those instruments ; in others it is made upon evidence which tends specifically to show that once they actually did exist, although they are not forthcoming." This statement is made with reference to the presumption of grants between individuals, but is cited here to exemplify the grounds taken. See note to same author, chap. XVI, note (1): "A grant of land will never be presumed from lapse of time, unless it be so great as to create the belief that it was actually made, or unless the facts and circumstances of the case show that the party to whom it is presumed to have been made was legally or equitably entitled to it." (Jackson *v.* Moore, 6 Cow., 706;

see Jackson *v.* Diffendorf, 3 Johns., 369 ; Hurst's Lessee *v.* McNeil, 1 Wash. C. C., 81 ; 1 Blackst. Comm., 75 ; 2 Blackst. Comm., 263, 264 ; 3 Kent's Comm., 445 ; Willkerson *v.* Prond, 11 Mees. & Well., 33 ; Lomax's Dig., 1 vol., 613, sec. 4 ; 2 Wash. on Real Prop., 294, note 1 ; 3 Serg. & R., 509 ; Sumner *v.* Child, 6 Com., 607.)

The other class of presumption of title does not arise from the possession alone, but in these there is long, uninterrupted, continuous, adverse use and enjoyment under claim of title, and is distinguished from the first by the circumstance of auxiliary evidence being coupled with time. Now, all the cases which are leaning towards the doctrine of presuming a grant from the government, within a comparatively short time, or by analogy to the statute of limitations, is founded on this second or latter class of presumptions.

It is said no time runs against the government; but in a proper case we will presume a title to one in possession.

How, it will be asked, can you do this? The answer is, by the party showing possession by use and enjoyment under claim of title beyond memory ; that is, nothing being known to the contrary of his possession, and if all the other facts and circumstances are consistent with his having the title, we will allow it to be presumed. But suppose we show a time within legal memory when this title actually did not exist, you cannot then presume the grant against the government, for if you do, you allow time to run against or bar the State? The reply is, here we allow his long possession to aid the party in introducing evidence, parol, documentary, or circumstantial, tending to show a title which he cannot produce and cannot safely swear has been lost. Thus we make this evidence available to show that there were title papers, and the long possession aids the imperfect or secondary evidence, and if these facts are sufficiently strong to make us believe that there was a title, we presume one, and this is from proof of a title aided by possession, and not by possession alone. (See Matthews,

205, 196.) In support of the second kind of presumptions, see Taylor v. Watkins, 26 Tex., 692, V: "Some very strong cases are to be found in the books, in which it is said courts of equity, and sometimes courts of law, have indulged presumptions of grants upon possessions comparatively brief; but such cases will be found for the most part to be cases in which the possession is aided by strong equities in favor of the party in whose behalf the presumption is indulged." Now, it is submitted that when in trespass to try title, plaintiff has to make affidavit of loss and search for a deed, and resort to secondary proof, he is really establishing his title by presumption. So, if the records of the land office should be destroyed, and a party having a recent patent had lost the patent and could procure no copy of it, he could prove the contents of it orally, after laying the proper foundation, and this would be similar to the second class of presumptions stated herein—the difference being only that the long possession and use supplies the place of the oath of loss and search for the instrument. It follows, then, if it can be shown that within legal memory the title claimed did not exist, the collateral proof of instruments and title must be more or less strong according to the length of time and other circumstances, but there must be such proof; and no case will be found in which possession itself of less than twenty years has supplied the place of legal necessity resting on a party to explain the absence of original testimony by oath of loss and search, in order to authorize the introduction of secondary evidence.

The first kind of presumption from long possession of a grant of land, when from the government, the possession must have the following qualities:

1st. It must be shown that the claim of title could have had a legal commencement. (Stark. Ev., 3 vol., 1205; Lewis v. San Antonio, 7 Tex., 304; Dangerfield v. Paschal, 11 Tex., 583; Taylor v. Watkins, 26 Tex., 692.)

2d. It must have existed before time of legal memory.

(Starkie, same, and authorities cited above under this head.)

3d. It must be uninterrupted and continuous. (Same authorities, Kent, 3 vol., 569; Taylor *v.* Watkins, above.)

In the case of Herndon *v.* Casiano, 7 Tex., 322, this court said: "Interruption by hostile Indians in 1813 made no difference, because the possession was shown back to 1757, and nothing to contrary, and the title good by presumption before 1813." (3 Wash. R. P., p. 52.)

4th. That possession means possession of the use and enjoyment. Starkie, 1202, *et seq.*, always uses the term "enjoyment." (Blackstone Comm., 2d book, 262; 2 Wash. R. P., 293; Kent, 3d vol., 569. The expression in Kent is "enjoyment," and sometimes "use."

5th. The possession must be adverse.

6th. It must be consistent with the claim of title.

7th. It must be by definite boundaries and co-extensive with them. (Dangerfield *v.* Paschal, 11 Tex., 579.)

8th. If the possession combines all these requisites, and the other facts and circumstances accompanying it are not inconsistent with the existence of a valid grant, a grant may be properly presumed by the jury. (Taylor *v.* Watkins, 26 Tex., 697, and on page 693, res. language quoted Judge Story in Ricard *v.* Williams, 7 Wheaton, 107.)

The other class of presumptions of title, when the possession is not so long, and must be aided by proof of some sort of the existence of supposed instruments, is governed by precisely the same rules except the second, *i. e.*, that the possession should extend beyond legal memory, but instead of that comes in the rule that there must be proof of title by some kind of secondary evidence sufficient to raise the presumption that there was a grant, and the possession is only one of the *indicia* of the title, the other parts of which must be established by evidence *aliunde* the possession.

These legal rules will fully explain all the cases decided

by our court, and also those quoted therein, if the distinction that stronger and fuller proof is required to presume a grant from the State is borne in mind.

Let us now see how these rules will apply to the case before the court.

First. It must be shown that the claim of title could have had a legal commencement. On this point the objection was raised by special demurrer to petition, setting forth the objection that the petition did not allege capacity in Ramundo Norris to receive the grant from Spain, and that it did not state that he was a citizen of Spain. This allegation was necessary because it was incumbent on the plaintiff below to prove it, and is one of the most important parts of his title by presumption.

In cases of presumption of grants between individuals this is not necessary, but is in all cases when the presumption is asked against the government. (See Starkie Ev., 3d vol., 1205; Taylor *v.* Watkins, 26 Tex., 695; and Dangerfield *v.* Paschal, 11 Tex., 583, and cases cited; Lewis *v.* San Antonio, 7 Tex., 304.) It must not appear that a valid grant could not have been made. This rule is violated. Ramundo Norris, in his petition to Salcedo, dated April 13, 1810, says he is an Englishman by birth. The proof shows that he was a native of Maryland, in the United States, and in his petition he says he has been for more than eight years a resident of the municipality of Nacogdoches, and the proof shows that he came to the country in the winter of 1805 and 1806, showing that his statement in his petition of eight years' residence was false.

When the plaintiff's own evidence discloses the fact that the party in whose favor the grant is to be presumed was an alien to the government from which he claims, it devolves upon him to show affirmatively that he has been naturalized, or that the laws of the country permitted a grant to him; and in this character of case it was certainly error in the court below to charge the jury that the Spanish law did

not permit grants to Englishmen, and it devolved on Norris to show some special license in his favor, and then add: "If you find, however, that the Spanish government did in fact make him a valid grant to this land, according to the evidence, before 1824, his capacity to acquire and hold land you will presume." This is the very question itself. In order to presume the grant they must find facts, and the special license to receive must be shown as one fact. A presumption cannot be based on a presumption. And that an alien could not hold land in these colonies of Spain is fully shown by reference to 2 White Rec., 59–61; 1 Id., 26, 355; 2 Id., 29, 60, 99, 213. See also Clay v. Clay, 26 Tex., 24.

This statement is a satisfactory explanation to my mind of the failure of Governor Salcedo to confirm the Norris title, and is strengthened by the false allegation of eight years' residence, and the proof that certain foreigners—Barr and Davenport—did get land granted by Salcedo. They, the evidence shows, had been in the country more than eight years, and there perhaps was some special license permitting foreigners of Catholic faith to obtain land after a residence of that lapse of time; which license we have been unable to establish at this date. Norris claims to have resided eight years, but in fact had only resided four years. Proof produced denying this statement to the governor may have compelled him to reject Norris's petition for land, even after commissioners had put him in possession.

The charge of the court was wrong, because in either kind of presumption, whether from immemorial possession or from long possession aided by collateral proof, it is an essential and absolute requirement that in presuming title from the government it should be shown that it could have had a legal commencement; in other words that the grant could have been lawfully and properly made.

We will examine as to the other qualities. As to the immemorial possession: The charge of the court distinctly says that the possession sufficient to presume a grant was

not made out, and the facts proven fully sustain the charge. Ramundo Norris, according to the proof, went on the land in 1806, and in his petition appellee says the land was granted Norris after 1806 and before 1824, and the date of the commencement of his possession was in 1806.

This would at once reduce the presumption asked for to the second class, and the petition commencing this action seeks to support only that kind of title. But if it should be said that the possession is long, uninterrupted, continuous, and adverse for a sufficient time to give the title without further positive proof, let us see if it will even bear that test.

Norris' possession commenced in 1806.

He left the country, the dominion of Spain, in 1813, and never returned until 1821. In Herndon v. Casiano, 7 Tex., 336, this court said an interruption in 1813 by hostile Indians was not such an interruption as would defeat the presumption, but that if it had been by the government or an individual claiming adversely it would have been different. The proof here is that there was a revolution in 1811, 1812, and 1813; that really extended to 1821; that it was the Mexicans against the Spaniards; that this governor, Salcedo, was killed by the revolutionists in 1812; that volunteers went to aid the Mexicans from the municipality of Nacogdoches in 1811 and 1812; that in 1813 the Spaniards, under Arredonda, were victorious at San Antonio and Spanish Bluff and were marching on towards Nacogdoches; that the inhabitants fled before them, and among others Ramundo Norris and his entire family, with all their goods, chattels, and stock, went into the territory of the United States and made permanent improvements on a farm, and resided out of the country until 1821, when the Mexicans were victorious; and although the testimony of Flores shows that there was no one at Nacogdoches and the place deserted, still the Norrises never once even visited the old ranche during all those years, although it was only sixty

miles from their new home.   Now, was this an interruption
or not?   Certainly it looks like one.   Nay, more, it was
an actual abandonment of the land and the country, and
raises in the mind a strong presumption that, if Spain had
succeeded in quelling the rebellion, the ancestor, Ramundo
Norris, and his family would never have returned.   His
abandonment was not *animo revertandi*, but to return if
Mexico and Texas gained their independence; and add to
the facts above recited that the revolutionary chief Sancedo
made haste to grant this same land to Norris under the
Mexican domination, and it strengthens this presumption
by showing that he was recognized as a friend of the rev-
olutionists, and himself did not intend, desire, or expect to
rely on his claim under Spain.   If this was not interrup-
tion of possession it will be exceedingly difficult, nay, im-
possible, to see how an interruption can occur.   In the case
of Herndon *v.* Casiano the party in possession fled to Mex-
ico from the Indians.   In this case he fled the dominion of
Spain.   As to interruption of possession under Spanish law,
see 1 Partidas, 391;, 1 White Rec., 93.

In Dangerfield *v.* Paschal, 11 Tex., 583, the court refers
to Paschal *v.* Perez, 7 Tex., 348, and says that in the latter
case "there was no proof of such continued possession as
would raise the presumption that a final title had issued."
And yet the proof was, as gathered from the decision on
page 363, that the parties had been in possession under an
incomplete title from 1808 to 1839.

In Paul *v.* Perez, 7 Tex., 338, there was proof of pos-
session from 1800, when the claimant was found in posses-
sion, (not the commencement of possession,) and held same
bodily until 1836, and proof to show that he kept an agent
and his stock on the ranche until his return in 1847 ; that
is, forty-seven years' known possession that extended back
beyond legal memory.   Here the abandonment was nega-
tived by his retaining an agent on the land.

In Herndon *v.* Casiano, 7 Tex., 322, the possession ex-

tended by proof to more than half a century before the interruption in 1813, and extended beyond legal memory. In Lewis *v.* San Antonio, Id., 298, there was possession from 1733 or 1734 to 1837, one hundred years, and also strong corroborative proof of the existence of the actual title itself. This is the only case in which this court has sustained a presumption of grant upon possession that commenced within legal memory, and here there was positive proof by persons who saw and read the grant itself. In Dangerfield *v.* Paschal, 11 Tex., 579, the possession extended beyond legal memory. The claim of title of Norris under Spain ceased in 1824. When Sancedo attempted to grant the land the occupancy was then under that title, and cannot be claimed to be under the title of 1810.

The border-league law went into effect in 1825, and this ranche being in the littoral leagues no grant could be made without the consent of the federal executive. See Yancey *v.* Norris, 27 Tex., 40, where it was decided in regard to this Norris grant that presumption of title could not arise from possession since 1825, and that they would not presume the confirmation by the federal government of Mexico. The border-league law was in force until 1836, and in 1838 the locations were made under which the appellant claims by patent, and from 1825 possession was not adverse. Ramundo Norris died in 1829, and his family moved off the grant, and the possession since that time is of a doubtful character as to presumption in Spanish law. (2 White's Rec., 79, 84, 86; 1 Id., 346, 350, 367.)

The possession was of a ranche with no defined boundaries, simply open marks made at the cardinal points, and no survey until 1838, and that survey conflicts with the Pena grant. * * * The counsel applied the principles discussed to the facts in an exhaustive argument.

*Richard S. Walker*, for appellee.

The case of Yancey *v.* Norris, 27 Tex., 40, was a suit

brought by the appellee in this case to recover the land here in controversy, in which he rested his right on long-continued possession and the presumption of the completion and perfection of the inchoate title issued in the year A. D. 1824 by Jose Antonio Sancedo, political chief, &c. Decisions made by the Supreme Court previous to the institution of the suit had led to the conclusion that possession for twenty, fifteen, and even a less number of years, would be sufficient on which to presume the existence of a grant—to presume conclusively whatever fact was essential to constitute a valid title. (Herndon v. Casiano, 7 Tex., 335 ; Lewis v. San Antonio, Ib., 288.) Upon that view of the law, as applied by the District Court trying the case, the plaintiff recovered. On appeal, however, the Supreme Court not merely reversed but dismissed the case, for reasons stated in the opinion.

When the plaintiff found that the Supreme Court had, in Yancey v. Norris, 27 Tex., 40, and Taylor v. Watkins, 26 Tex., 688, repudiated the language which had been employed by the court in the series of cases decided by it, and that they laid down other and different principles as the rule under which presumptions of grants would be deduced than those which the country had, from its opinions, taken to be the law, he found it necessary to institute this suit, and to rely for a recovery upon the very facts of his title, as distinguished from the illusive and indisputable presumption arising from possession under an incomplete or imperfect title, so freely commented upon in the train of decisions referred to.

The plaintiff then alleges a grant to his ancestor in the year 1810 ; that it was lost or destroyed, and avers a continuous possession under it to the present time—a period of nearly three-quarters of a century—through all the mutations of human affairs and political revolutions. The cause has been again tried, and plaintiff's right to recover has been subjected to the test of the doctrines prescribed in Taylor v. Watkins and Yancey v. Norris strictly applied,

and the same result in the District Court has been reached:
a jury has again found a verdict in his favor.

The argument proceeds to discuss at length the assign-
ments of error which involve the sufficiency of the allega-
tions of plaintiff's petition, the charge of the court, and its
refusal to give the counter-charge asked by the defendant.
It then replies to the argument of appellant's counsel that
the verdict was without sufficient evidence, and in conflict
with the principle that a grant would not be presumed from
possession alone, in cases where there could have been no
legal commencement, and urges that the doctrine thus in-
voked has no application to the facts of this case, insisting
that the grant is not sought or asked to be presumed from
possession alone, but that the auxiliary facts and evidences
of title fully warrant the presumption of a legal commence-
ment and a capacity in the grantee, Ramundo Norris, to
take, and proceeds on that head to remark that it certainly
is good and familiar law that where, from the nature of the
grant asked to be presumed it is impossible that such an
one could have been made, it will not be presumed.   The
illustrations of this doctrine, as in the alleged grant of the
Forest of Dean, (which was prohibited by law, see Lewis *v.*
San Antonio, 7 Tex., 308,) exhibit the proper application as
well as the appropriate limitations and qualifications of
such a principle.   As applied to this case, such an attempt
to defeat the presumption of a grant is not even plausible.
It is even frivolous to attempt to apply that doctrine to a
grant claimed to have been made to an inhabitant of the
province certainly, and a citizen probably.   Such a grant,
if it had been even irregular and unusual, was not, in the
nature of things, impossible; being an estate possible to
have been acquired, it was not, therefore, an impossible
estate.

The argument proceeds to discuss the evidence tending
to establish circumstantially the actual issuance of a grant
in aid of the possession, such as the petition to the governor

by plaintiff's ancestor, Ramundo, for the land whilst that official was in the immediate vicinity on a mission to make grants to settlers; the actual survey caused by the governor to have been made in pursuance thereof; the Catholic faith of the applicant and the respect in which he was held by the citizens and officers of the government; the rejection of others on account of their religion; the recognition ever afterwards of his right and title to the land by the citizens and officers of the government; the fact that no objection was made by the governor to the survey made for Norris, nor opposition, nor objection from any source whatever; that this title or survey, in common with all others which were unfinished, were "called in" and taken by the governor to San Antonio for confirmation, and the revolutionary condition of the country for years afterwards, with the destruction and loss of records and titles at San Antonio, from which, with other matters dwelt upon in the argument, it was insisted that such facts justified the jury in finding, and their verdict was well supported in saying that the grant did in fact once exist, and that it was indeed lost or destroyed.

Thus have I endeavored to point to positive and direct evidence of facts and circumstances before and subsequent to the supposed date and existence of the grant, as auxiliary evidence to the proof of long possession, to support the verdict, and thus meet even the most stringent exactions prescribed by the able brief of my learned and accomplished adversary. But the verdict needs not one-half the support which it receives from the testimony; it may stand with much less. In Lewis *v.* San Antonio, 7 Tex., 308, the court say: "The conclusion from the authorities referred to is, that according to the common law of England the possession of land uninterrupted and exclusive with the exercise of ownership for the term of twenty years raises a presumption of a grant under which possession must be supposed to have commenced, unless there are circumstances

that rebut such a presumption and show that there could not have been a grant such as was shown in the case of Goodlittle on the demise of Parker *v.* Baldwin; that the statute restrained the crown from granting the Forest of Dean, which rebutted and forbade the presumption; that the possession had commenced under a grant; but for this prohibition a grant would have been presumed against the crown. That this is the common law as understood in the several courts of the United States, modifying the rule in some of them in analogy to their statutes of limitation there can be no doubt." (Lewis *v.* San Antonio, Ib., 308.) The common law prescribes the same rule of presumed grants from the government in respect to water courses, bays, rivers, fisheries, &c., as will be seen on proper examination. The English government, where a constitutional monarchy exists, would have a far narrower application to the powers of an absolute monarchy, as was the King of Spain in 1810. The public domain of Spain was the subject of the absolute disposition of their royal owner, and whilst the general law may have forbidden generally the acquisition of lands by foreigners, as is the general law of all nations, yet the history of Florida, Louisiana, Mexico, and of all Spanish possessions show that foreigners did receive and hold lands and enjoyed rights of citizenship. (See White's Recop., *passim.*) Where an impossible condition exists title will not be presumed from possession alone, but where the grant may or may not have been legally made the presumption of fact will arise or not, accordingly as the evidence may satisfy the mind the one way or the other. Then I contend in this case that the simple possession and claim of ownership by defined metes and bounds, claiming to hold under a grant by one who might possibly have taken and held, would satisfy the doctrine laid down in Lewis *v.* San Antonio. The review made of the older cases, in the opinion in Taylor *v.* Watkins, 26 Tex., 695, the court upholds all that has been decided on the doctrine of the presumptions of grant, except

in so far as the cases had indicated that the presumption was one of law and indisputable, and not subject to be countervailed by rebutting testimony, and also qualifying the force of remarks in Morris *v.* Byers, 14 Tex., 279, by Mr. Justice Lipscomb, and, therefore, I feel assured that on the authority of all the cases the verdict does not require the support even of the ample auxiliary testimony which so strongly indicates the actual existence of the grant.

The appellant's effort to dispute the continuity of the possession is vain. The abandonment of the country is shown to have been general, and constrained by a hostile invasion rendering no man's life safe. Appellant's counsel labors by most artificial reasoning to treat the invasion as an interruption of the possession of Norris—a species of ouster, adverse entry, a proceeding analogous to that of " office found."

The revolution did not divest rights. The military operations were neither directed against nor had reference to civil rights nor land titles. Absolute conquest and subjugation even would have worked neither forfeiture nor divestiture of title nor possession. It is in evidence, too, that Norris took no part on either side in the commotions of the times and was a loyal citizen to the existing governments. Counsel insist that in seeking refuge in Louisiana " he fled the dominion of Spain." In no proper sense can the charge be made. But it is true that he, in common with the whole population, sought safety from the terrors of threatened massacre. It was no voluntary abandonment of the country, and it would not affect the question, if indeed it had chanced that he favored in sentiment the revolutionary party, for leaving with the intention of returning under such circumstances. By every principle of law and reason he continued constructively in possession. (Herndon *v.* Casiano, 7 Tex., 336.) With as much reason might it be said that a possession was lost from the incursions of Indians by

the frontiersman forced to abandon for a time his home; and as well might it be said that refugees to Texas from sister States during the late war fled from the dominion of their own States, and thereby lost their possessions. But aside from the reply I have given on this point, I have further to remark that the point made on this head is based on a misconception of the character or degree rather of possession required to raise the presumption. Whilst the statutory bar of limitations requires continuity of possession the requisite period, yet in order to raise a presumption of title or grant it is not of the essence nor reason of the matter that it should be actual, continuous, and adverse; but the essential feature exacted is that it should be long continued, exclusive, and uninterrupted. The presumption is derived from the usual concurrence of long-continued claim, possession, and acts of ownership with the real fact of true ownership, and therefore a continuous *pedis possessio* during the whole period does not enter into the reason of the rule. And here has been the actual, physical, and constructive possession, without interruption by others from any quarter, from 1806 until 1830 or afterwards, continuing to hold the same by tenants ever since to the present time, without any other interruption than is shown in the testimony growing out of locations and settlement by defendant. Therefore, for all the purposes of the presumption, he and his ancestors have had a possession uninterrupted since 1806; and if the temporary absence during the war of 1813 were carved out of it the facts of the case would be in no wise weakened, but strengthened by the circumstance of a return in 1820 to the same home, as by one assured of his ownership returning to the enjoyment of his own and there remaining up to his death. "It seems to be well settled that the presumption will always arise, unless it appears that no valid grant could ever have been made. It appears therefore to be well settled in the English courts that a grant will be presumed from lapse of time when it is to

support a right in possession and long enjoyed. And the only qualification to the rule seems to be that it must not appear that a valid grant could not have been made." (Lewis *v.* San Antonio, 7 Tex., 304, and see the whole opinion and the authorities quoted and cited for a conclusive illustration of the correctness of the doctrines throughout for which appellee's counsel contends in this case.)

In the same opinion just referred to Justice Lipscomb, adverting to the American doctrine, shows from Greenleaf the discrimination made between conclusive and disputable presumptions, the former applying mainly to limitations by statute and prescription, and quotes: "Sometimes this common consent is expressly declared through the medium of the Legislature in statutes. So the possession of land for the length of time mentioned in the statutes of limitation, under a claim of absolute title and ownership, constitute against all persons but the sovereign a conclusive presumption of a valid grant." * * "Thus the uninterrupted enjoyment of an incorporeal hereditament for a period beyond the memory of man is held to furnish a conclusive presumption of a prior grant of that which has been so enjoyed. This is termed title by prescription. If this enjoyment has been not only uninterrupted but exclusive and adverse in its character for the period of twenty years, this also has been held at common law as a conclusive presumption of title. There is no difference, in principle, whether the subject be a corporeal or an incorporeal hereditament. A grant of land may as well be presumed as a grant of a fishery or a common or a way. The possession of land, however, for a shorter period, when coupled with other circumstances indicative of ownership, may justify a jury in finding a grant." * * "Though lapse of time does not of itself furnish a conclusive legal bar to the title of the sovereign, agreeably to the maxim *nullum tempus occurrit regi,* yet if the adverse claim could have had a legal commencement juries are instructed or advised to presume such commence-

ment after many years of uninterrupted adverse possession or enjoyment."

In the case of Coolidge *v.* Learned, 8 Pick., 508, quoted in the case of Lewis *v.* San Antonio, Judge Wild remarks: " Thus it appears that although prescriptive rights commencing after the reign of Richard the First are not sustained in England," (because, as he shows, of legislative enactments requiring that construction,) " yet a possession of twenty years only is sufficient to warrant the presumption of a grant, which is the foundation of the doctrine of prescription," *et seq.*    (Lewis *v.* San Antonio, 7 Tex., 307.) As to what constitutes the period of " legal memory" or " beyond the memory of man," essential perhaps to be maintained in establishing prescription at an earlier age, seems by English and American laws now to conform not to the exactions prescribed by appellant's argument, but to a reasonable, fixed, and arbitrary period in analogy to statutes of limitation.    (See Coolidge *v.* Learned, *supra;* see also 1 Greenl. Ev., sec. 17, and note 1, and authorities there cited.)

" Accordingly royal grants have been thus found by the jury after an indefinitely long-continued peaceable enjoyment, accompanied by the usual acts of ownership.    So, after less than forty years' possession of a tract of land, and proof of a prior order of counsel for the survey of the lot, and of an actual survey thereof accordingly, it was held that the jury were properly instructed to presume that a patent had been duly issued."    (Citing Jackson *v.* McCall, 10 Johns., 377; 1 Greenl. Ev., sec. 45.)    The principle and case just cited seems to be fully in point; the facts in both are sufficiently parallel with each other to render a discriminative difference impossible so far as relates to the principles under discussion, except as regards the greater fullness of time of possession, and increased number of circumstances and acts consistent with the actual existence of a grant as exhibited by the case at bar.

Under the proof made, the jury were satisfied that the grant was made, and found accordingly; and if they had found otherwise, such finding would have been in flagrant violation to the rule in England and elsewhere, generally in the United States, which requires them under the advisement and direction of the court to presume a grant to have been made. The duty of the jury thus to presume, it is obvious from all the learning on the subject, has become equivalent in substance to an inflexible presumption of law, the disregard of which in a case like the present or any proper case would be tantamount to the disturbance of a rule of property, an usurpation of right, a reckless overthrow of a sacred muniment of title; for the benefit of this legal presumption (a presumption of fact, if you please, in deference to the formal destruction claimed in Taylor *v.* Watkins,) stands in the stead of records, patents, deeds, and whatsoever else collateral that may be necessary to protect ancient possessions acquired and held under circumstances consistent with the possibility of a grant having once issued.

The case was submitted under the views and charge of the court, prescribing throughout the test required by the "straitest sect" of adherents to the doctrines held in Taylor *v.* Watkins, Yancey *v.* Norris, and subsequent cases. I think it is demonstrated that all those matters which form the subject of criticism by the appellant are only so many superfluous but auxiliary evidences going in aid of the long-continued possession.

The whole argument proceeds upon the idea that such auxiliary testimony is to be estimated as testimony offered to prove the very fact itself of the existence and contents of the grant. Whereas in truth our petition discloses the fact that we do not profess to know even of its contents, nor expect even to show the fact of its existence. It is to protect possessors of land thus situated that the law prescribes under proper circumstances the existence of the grant from even possession alone. The supplemental and auxiliary

facts offered are adduced as circumstances merely. Yet in this case they are not only consistent ones, but most cogent to increase and add to the strength of the presumption which law and reason alike indulge that the grant did indeed issue, but they are not necessary or essential to the vitality of the presumption, and if they do not rebut, deny, nor countervail the inference and presumption arising from long possession, if they failed to add to the strength of the case, they would certainly not weaken it. I have not been able to discover in the cases of Dangerfield *v.* Paschal and Paschal *v.* Perez the slightest verification of the assumption by counsel for appellants, usually accurate. I imagine in this instance his reference is inadvertent; the latter case turned on the paper title; no such possession existed, it seems, as indicated, but the reference is singularly apposite for appellee, for see Dangerfield *v.* Paschal, 11 Tex., 583, where it is remarked that " the aspect of the case of Paschal *v.* Perez would have been materially changed if it had been supported by a long-continued occupancy and enjoyment, and when so coupled it will always arise, unless it be shown that it never could have been granted," as by the prohibition in the case of the Forest of Dean. The court then refers to the cases of Herndon *v.* Casiano and Paul *v.* Perez, approving of the maintenance in them of the doctrine of presuming grants from possession. The case of Herndon *v.* Casiano is in itself quite sufficient to rest this case upon. In it we see that notwithstanding proof by direct testimony that a grant did once exist, yet the court dispense with it as a prop necessary to support the title, but say continued possession alone sufficed to presume the grant. The Hernandez had been driven out from their home and ancient possessions by the revolution and hostile savages, (see p. 326 ;) yet after so long a possession, say the court, it, unsupported by other circumstances, would be sufficient to authorize the presumption of a grant derived from the government. The court lay stress, too, on the facility with

which lands could be obtained in this then untamed, vast
waste.   The court adverts to the corroborating circum-
stance of succeeding governments respecting the rights of
the Hernandez.   So in the case at bar did the government
of 1824 recognize and endeavor to approve and confirm our
title.   The Hernandez being driven off in 1813 seem to
have never returned.   It was proved that the ranches were
broken up by the revolution and hostile Indians.   Ra-
mundo fled under the identical same danger and occasion,
but he returned to his ranche.   It is simply idle to attempt
an invidious discrimination in the two cases, to the disad-
vantage of the heirs of Norris.   Furthermore, the title
papers of Norris were carried in 1810 to San Antonio by
the governor, there to encounter the chances of the war, on
the verge of which the country stood.   The plaintiff alleges
their loss by that means, and the jury had a right to be-
lieve they were thus lost ; and the facts proven in Herndon
v. Casiano show that the public archives were scattered and
left to the mercy of chance, "and that persons took posses-
sion of those in which they were interested." (p. 326.)
Yet the title of the Hernandez being held consummate in
1813 by presumption of a grant, was held valid without
further acts of ownership for nearly a half century as against
a recent certificate and survey.   Norris showed, as did those
claiming under the Hernandez, that his lands and title had
been respected by the different governments, and he was
recognized by the citizens as the owner.   Further comment
or attempted analogy need not be made.

The case of Paul v. Perez, 7 Tex., 338, reaffirms the
principles of the preceding case just adverted to.   There
was no evidence of the existence of any paper, title, or grant
whatever.   Possession and claim only, and that only from
1800 to 1836, when the claimant went to a foreign country
and remained till 1847.   His ancestor asserted claim and
title in his will to the property ; yet the court did not treat
the matter as even debatable, and rested a clear, unequivo-

cal opinion in favor of the claim as against a patent issued in 1847 on the presumption of title arising from possession and claim alone. How vastly stronger is the case of Norris? Having shown that no violence has been done to principle by either the court or jury, as I think I have done, it needs no argument to maintain that the verdict must stand.

Counsel then discussed the rules governing new trials, citing Ward v. Bledsoe, 32 Tex., 251; Cox v. State, 32 Tex., 610; Menifee v. Hamilton, 32 Tex., 514; Edrington v. Kiger, 4 Tex., 89; Latham v. Selkirk, 11 Tex., 314; Goss v. McClaren, 17 Tex., 107; Ables r. Donley, 8 Tex., 331; Sweeney v. Jarvis, 6 Tex., 36.

IRELAND, ASSOCIATE JUSTICE.—The plaintiff below brought suit for four leagues of land situated in Nacogdoches county, and claimed title by virtue of being a child and heir of Ramundo or Edmond Norris. He alleges that the land was granted to his ancestor "at some period between his entry into possession in 1805 or 1806 and before 1824." That he bought the Ranche "Naconichi," situated on this four leagues, from one McWilliams.

He introduced in evidence a petition to the political chief, dated in 1810, asking a concession to this four leagues, and a confirmation or completion in 1824, and proved possession by his ancestor from 1806 to 1813, and from the cessation of the troubles between Spain and Mexico, about 1820, to the death of his ancestor in 1829 by himself and tenants to the institution of the suit. The appellant relied upon patents issued about 1844. The title issued in 1824 has been heretofore declared by this court of no validity. (Jones v. Garza, 11 Tex., 186.)

The appellee appears, in the court below and in the conduct of the case in this court, to abandon the idea of claiming or holding the land by virtue of his paper title exhibited in evidence, and relies upon his long possession as evidence from which a grant from the government ought to be pre-

sumed. The validity of appellee's title and claim of right to the presumption of a grant was decided adversely to him in the case of Yancey v. Norris, 27 Tex., 47. In the elaborate and very able brief of appellee filed in this cause he says that he framed his pleadings and managed his case below so as to meet the objections to his title pointed out in the case of Yancey v Norris.

It is true that in this case the plaintiff below has alleged that his grant was prior to 1824, thus avoiding one of the difficulties encountered in Yancey v. Norris, arising out of the fact that the land was within the border leagues. But the fact still remains "that the fact that the application made by Ramundo Norris in 1810 was found among the public archives, without any evidence that any action had ever been taken upon it by the public authorities, might be supposed to repel the presumption that any grant had been made upon that application." (Yancey v. Norris, 27 Tex., 40.)

The law of prescription and limitation, now used as convertible terms, has existed in all civilized countries except among the Jews, and no feature of either the civil or common law has undergone more changes. The doctrine of prescription first arose and was applied to easements and not to the thing itself.

This doctrine of prescription and limitation was only applicable as between individuals. The rule or maxim of " nullum tempus occurrit regi " was always a shield to the crown or government. As veneration for royalty and a belief in the divine right of kings grew less potent, judges, by a fiction, found a way to avoid this rule by telling juries in very strong cases that they could presume a grant from the government.

But this was, in its origin, applied to some incorporeal right, and not to the fee to the soil. In a few of the American States courts have allowed juries to presume grants to the fee from the government, and it cannot be denied that

16

the earlier cases in our own courts have impliedly, if not expressly, recognized the doctrine in this State. (Herndon *v.* Casiano, 7 Tex., 335, and Lewis *v.* San Antonio, 7 Tex., 288, and other cases.)

Notwithstanding the doctrine of presumption of grants from the government seems to be recognized by this court, yet no case has gone to the length of establishing title based on presumption.

It is not pretended that McWilliams, from whom plaintiff's ancestor bought, had any title.

We understand the rule to be in this class of cases, when a title is to be shown from the government, that juries may be told that they can presume a grant to have issued, not that they must so presume. No well-considered case can be found, we apprehend, where a grant to the fee has been presumed, if the party, in making out his case, shows that in fact no grant ever did exist, or where he fairly disproves the presumption.

We think it now pretty well understood that this presumption is subject to be disproved, just as you might disprove or defeat limitation when plead in a suit on a note at common law, by showing a payment, or an admission, or any other fact which would rebut the presumption arising from lapse of time. (Taylor *v.* Watkins, 26 Tex., 688, and authorities cited.) On the other hand, cases may be found in which courts and juries have gone to the length of presuming a grant in the face of the almost admitted fact that none ever did in fact exist. This class of cases, however, are referable to incorporeal hereditaments and not to the thing or fee. Centuries had elapsed in the history of landed property before it was even supposed that the presumption of a grant could be indulged by the courts against the crown, but finally the subterfuge before spoken of was resorted to.

In 9 Serg. & R., 26, the Supreme Court of Pennsylvania say, "Length of time cannot be said to be, like the statute

of limitations, an absolute bar.'' In 6 Pet., 666, in a case in many of its features like the one at bar, and in which the doctrine of presumption was invoked, the court say, ''It is a well-settled rule that the statute of limitations can never bar the government. If this were so, it would only be necessary for an intruder to hold on until length of time would invest the intruder with title against the government and all persons claiming under it.''

The government could not at common law bring ejectment, because before ejectment could be maintained the lessor of the plaintiff must be disseized, and the government could not be disseized, and no laches could be imputed to the government. (Miller v. Garlock, 8 Barb., 153.) The government was not, however, powerless. It had a right to the ''writ of intrusion.''

In all cases where a party seeks to hold by a presumed grant he had to show long possession, adverse exclusion, and to well-defined metes and bounds. In the case at bar the tract of land is four leagues, and was surveyed, as shown by the proof, by a man getting on a mule with a rope and measuring three miles each way—east, west, north, and south—from the ranche or improvement. There is no evidence of enclosure or actual occupancy, except the place called Naconichi.

Adverse claims were located on the land in 1838. The plaintiff below clearly did not seek to show that in fact a grant had been made to him by the Spanish government, but that he relied upon his long possession to raise the presumption of a grant. Appellant asked the court below to give this instruction : '' The defendant asks the court to charge the jury that, in proving title by presumption of a grant from the government, it devolves on the plaintiff to show that Ramundo Norris was a competent person to receive and hold such grant, and such fact must be established by proof, either positive or circumstantial, and not a mere presumption.'' This charge was refused, and its re-

fusal is one of the assigned errors for a reversal. That it was the general policy and law of Spain that foreigners could not hold or receive a concession to land is well known.

It is true, if a party shows a grant in fact from a government having such laws, the presumption of course would be that the grant was properly made. The power of the king of Spain to make a grant to a foreigner will not be questioned, notwithstanding the general laws of that kingdom, yet when a party seeks to hold land by title emanating from and under that government, by presumption of a grant based on long possession, it would be going too far to base that presumption upon another presumption, to wit, that the party was competent to take. A presumption cannot for its support rest upon another presumption.

This doctrine of presumption has been indulged in so little by this court that where a party has shown grants to land within the border leagues since the enactment of the colonization laws of 1825, they have been required to show an express ratification by the supreme government before their titles have been allowed a standing in the courts.

We believe, therefore, that the refusal of this charge by the court below was error. Ramundo Norris was shown to be a native of Maryland. We believe that the last charge asked by defendant below on the subject of possession in cases of presumed grants was also the law of this case, and that it was error to refuse it. It is also apparent that the finding of the jury in this case was contrary to the law as given them by the court, and for that the verdict should have been set aside. We have no disposition to disturb the law on the subject of presumption of grants as heretofore established by this court. But while we believe that the plaintiff has not shown himself entitled to the four leagues sued for, it is not so clear that he is not entitled to six hundred and forty acres to include his improvement.

The title under which appellee claims had its inception in 1838, the date of the locations.

While limitation does not run against the government, the location was such right as will be protected under our form of government. (Sherwood *v.* Fleming, 25 Tex. Supp., 408.)

This is unlike the rule in other States of the Union and the United States. There inchoate rights are under the control of the government.

Limitation would therefore commence to run from the date of the location in 1838, the land being adversely held and claimed by Norris. (Hamilton *v.* Kimbro, 28 Tex., 560.)

We see no valid reason disclosed by the record in this case why appellee is not entitled to six hundred and forty acres. Admitting that plaintiff's ancestor only took possession after his return from Louisiana, this was before the location by those under whom appellant claims.

The proof pretty clearly shows that plaintiff has maintained his possession by himself and tenants up to the institution of the first suit in 1854. This we think would entitle him to six hundred and forty acres. (Paschal's Dig., art. 4624 ; Smith *v.* Power, 23 Tex., 29 ; Charle *v.* Saffold, 13 Tex., 111, and cases cited in note 1033.)

For the errors pointed out the judgment is reversed and the cause remanded.

REVERSED AND REMANDED.

[Chief Justice ROBERTS and Justice MOORE did not sit in this case.]